# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 10, 2011 Session

## KLEIN ADLEI RAWLINS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sumner County**
**Nos. 180-2002, 946-2007     Dee David Gay, Judge**

---

**No. M2010-02105-CCA-R3-PC - Filed September 27, 2012**

---

The petitioner, Klein Adlei Rawlins, appeals the Sumner County Criminal Court's denial of his petition for post-conviction relief. The petitioner was convicted by a jury of first degree felony murder and aggravated child abuse. He was sentenced to consecutive sentences of life with the possibility of parole and twenty years. On appeal, he contends that the post-conviction court erred: (1) by concluding that he received the effective assistance of counsel; and (2) by denying his request for funds to assist post-conviction counsel in investigation of the post-conviction petition. Following review of the record, we find no error and affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Louis W. Oliver, III, and James A. Simmons, Hendersonville, Tennessee, for the appellant, Klein Adlei Rawlins.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History & Factual Background

The facts underlying the petitioner's two convictions, as stated by this court on direct appeal, are as follows:

Donnie Wilkinson, with the City of Portland Fire Department, testified that he received a dispatch call instructing him to go to a residence where a child was not breathing but was receiving C.P.R. When he arrived at the residence, no one was performing C.P.R. on the child, and the child's mother was hysterical. Wilkinson began to perform C.P.R. but was unable to obtain an open airway because the child's body was in a state of rigor mortis. Wilkinson knew that the child had died but continued to perform C.P.R. because the child's mother was upset. Wilkinson saw a man at the residence, who he presumed was the victim's father, and noted that the man seemed pretty calm.

Ray Hall testified that he also responded to this call as an employee with the Sumner County Emergency Medical Services (EMS). He saw the victim's mother crying on the couch and two EMS personnel performing C.P.R. on the victim. He tried to detect the victim's pulse, found none, and then noticed that the victim was in a state of rigor mortis. Consequently, he discontinued C.P.R. because when rigor mortis is present reviving the victim is impossible. He told the victim's mother that the victim had died. The [petitioner], whom Hall presumed was the victim's father, sat in the living room and was visibly upset.

Melvin McLerran, a lieutenant with the Portland Police Department, responded to a dispatch call, arrived at the victim's residence, and spoke with the [petitioner]. The [petitioner] told Lieutenant McLerran that the victim's mother woke the [petitioner] and told him that the victim was not breathing. The [petitioner] then described how he performed C.P.R. on the victim.

Tracy Kizer, an administrative assistant with the Portland Police Department, described how 911 calls are received and transferred to emergency personnel. Beverly Pardue, the Sumner County EMS dispatch supervisor, described how dispatch calls are recorded, and a recording of the 911 phone call made by the victim's mother was played before the jury. During this phone call the victim's mother said that her two year-old daughter was not breathing but was warm to the touch and that someone was performing C.P.R. on her daughter.

Katisha Bratton testified that she is the victim's mother and that she lived with the [petitioner], who was unemployed at the time and who was her son's father. She explained that the victim had been potty trained but still had accidents at night, and the [petitioner] got mad because Bratton did not

discipline the victim when the victim had accidents. Bratton had surgery a week before the victim's death, and the hospital prescribed hydrocodone for pain.

Bratton said that, the night preceding the victim's death, the victim fell asleep next to Bratton on the couch around 9:00 or 10:00 p.m. Bratton did not let the victim sleep with her on the couch because the victim had accidents, which angered the [petitioner]. Consequently, Bratton put the victim to bed in a different bedroom. The victim went into the [petitioner's] bedroom and woke him up, and Bratton woke up when she heard the [petitioner] screaming. The [petitioner] told Bratton to come get this "fu*king kid." Bratton retrieved the victim from the [petitioner's] bedroom and put the victim to bed. She argued with the [petitioner]. She took a hydrocodone while she was arguing with the [petitioner] because she got tired of listening to him, and the hydrocodone put her to sleep.

At 10:00 a.m. the next morning, Bratton went into the victim's bedroom and tickled the bottom of the victim's feet to wake her up. She picked up the victim, realized that the victim was stiff, got the [petitioner], and he started to perform C.P.R. on the victim. Bratton called 911. The [petitioner] told her not to make that phone call because he did not need "this sh*t." After Bratton called 911, the [petitioner] told her that the victim was warm and that the victim had a pulse, and she relayed this information to emergency personnel.

On cross-examination, Bratton acknowledged that neither she nor the [petitioner] had a job, that the time period preceding the victim's death was stressful, and that she was having difficulty dealing with stress. Bratton asserted that she was aware of her surroundings on the night of the victim's death even though she had taken a hydrocodone, which dulled her senses. She denied drinking any alcohol. She acknowledged that detectives asked her about dried feces found on the floor in the victim's bedroom, but she could not recall why the feces was there. She explained that the victim had had a bowel movement during the night, and, when she found the victim the next morning, she removed the victim's clothing.

Bratton acknowledged that, after the victim died, someone reported that Bratton had overdosed on her hydrocodone prescription, and an ambulance came and took her to a hospital. Bratton told hospital personnel that she had not overdosed on her medication, and the hospital personnel released her. She testified that she overheard police officers say that she was schizophrenic, and

-3-

this angered her. She called the police department about several things that made her angry and "lashed out" at whomever answered the phone. Bratton denied having a problem with anger or any other mental health issues. Bratton acknowledged that the [petitioner] did not get along with the victim's father and her relatives, and she acknowledged that perhaps the [petitioner] chose not to attend the victim's funeral in order to ensure that the funeral was peaceful.

Thomas Deering, M.D., an expert in the field of forensic evidence, testified that he performed an autopsy on the victim. During this autopsy, he found blood in the victim's abdominal cavity and bruises on the victim's internal organs, which are indicative of trauma or abuse. Dr. Deering described various aspects of the victim's medical condition that suggested she died from strangulation. He also described various photographs of internal bruises located on the victim's neck, which suggested that someone placed hands on the victim's throat. The doctor opined that all of the victim's internal bruises occurred prior to her death. Dr. Deering then identified a picture of the victim's back and identified multiple bruises and contusions, explaining that these bruises occurred before the victim's death and indicated that the victim was possibly thrown and landed against a wall. Dr. Deering noted that the victim was in rigor mortis when he examined her, making her body stiff. The doctor said that it was not possible to detect a pulse in an individual's body that was in a state of rigor mortis. Further, finding an airway through which to perform C.P.R. on an individual in this state would be extremely difficult.

Anthony Reece Green testified as a field paramedic with Sumner County EMS about the responses that a child's body would have to asphyxiation. He testified that when an individual's life functions cease, the individual is likely to defecate because smooth muscles relax when an individual dies. On cross-examination, Green acknowledged that an individual could have a bowel movement prior to his or her death and then not defecate again after the life's functions cease.

Jeanie Cole testified as an employee with the Department of Children's Services and explained that she and Lieutenant Stan Jones went to the victim's residence the day after the victim died. The [petitioner] answered the door but did not allow them to enter the residence. He got into a car with Detective Jones and Cole and agreed to help them locate the victim's mother. He told Cole that he felt guilty about what happened to the victim. He explained that the victim had awakened him in the middle of the night, and he screamed at her while she was shaking and crying. He told Cole that he found the victim

the next morning and asked Cole if his C.P.R. performance could cause the victim to bruise. On cross-examination, Cole acknowledged that the [petitioner] showed concern for the victim's mother.

Karen Johnson testified that she lived near the victim and that she saw the [petitioner] shortly after the victim died. She asked him what happened to the victim, and he refused to discuss the victim's death. Johnson testified that she never saw the [petitioner] with the victim unless the victim's mother was with them. She later spoke with the [petitioner], and he told her that he was very tired and confused the night the victim died. He explained that the victim's mother had fallen asleep and that the victim kept coming into his room and awakening him. He told the victim to go wake up her mother, but the victim just kept crying. The [petitioner] told Johnson that he spanked the victim.

Lieutenant Stan Jones testified that he arrived at the victim's residence after emergency personnel determined that the victim had died. He photographed the crime scene. He interviewed the [petitioner] twice; once the day after the victim died and then again a month after the victim died. He provided the [petitioner] with *Miranda* warnings prior to each interview. During the initial interview, the [petitioner] told Lieutenant Jones that the victim came into his room around midnight, and he sent the victim to her mother. The [petitioner] said that the next morning the victim's mother awoke screaming because the victim was not breathing, and he described how he performed C.P.R. on the victim. During the interview that occurred a month after the victim died and the autopsy had revealed that someone had suffocated the victim, Lieutenant Jones asked the [petitioner] if he abused and suffocated the victim, and the [petitioner] denied these accusations.

Lieutenant Jones explained that police officers arrested the [petitioner] for the victim's murder on account of the [petitioner's] inconsistent statements and the lies he told when the victim's mother called 911. He also found the [petitioner's] description of how he performed C.P.R. on the vicim to be suspicious. In contrast, the victim's mother, the only other adult in the home at the time of the victim's death, provided police officers with consistent statements and looked them in the eye when she spoke with them.

Lieutenant Jones testified that he spoke with the [petitioner] a third time, after the [petitioner] had been arrested and placed in jail. From his jail cell, the [petitioner] requested to speak with Lieutenant Jones. Lieutenant

Jones met with the [petitioner], and, during this interview, the [petitioner] stated that he had been awake for four to five days prior to this incident and had no money. The [petitioner] told him that he was under a great amount of stress living without a job and trying to take care of his family. The [petitioner] then admitted that he had been deceptive to Lieutenant Jones throughout the course of the investigation. Lieutenant Jones testified that both the [petitioner] and the victim's mother had said that they argued until 2:00 a.m. on the night the victim died.

On cross-examination, Lieutenant Jones acknowledged earlier stating that the victim's mother had lied during investigative interviews but stated that the victim's mother generally provided police officers with consistent statements. Lieutenant Jones agreed that, when he spoke with the [petitioner] in jail, he had finished investigating the crime and concluded that the [petitioner] killed the victim. He also acknowledged that he used investigative tactics in hope to gather information during this interview.

*State v. Klein Adlei Rawlins*, No. M2006-01059-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 20, 2007).

Based upon these actions, the petitioner was indicted by a Sumner County grand jury for aggravated child abuse and felony murder in March, 2002. Thereafter, attorney C. Ronald Blanton was appointed to represent the petitioner. However, in August of that same year, Mr. Blanton began working as an assistant district attorney general. His request to withdraw from the petitioner's case was granted, and trial counsel was appointed. Trial counsel immediately filed a motion to recuse the Office of the District Attorney General of Sumner County from the proceedings. After a hearing, the trial court denied the motion, but did allow the petitioner to file an Application for an Interlocutory Appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. This court denied the appeal, but did note that the issue was appealable pursuant to Rule 3 if the petitioner was convicted.

Following a trial by jury, at which the theory of defense was reasonable doubt *i.e.*, that the victim's mother was the guilty party, the jury convicted the petitioner of first degree felony murder and aggravated child abuse. *Id.* The jury imposed a sentence of life in prison for the murder conviction, and the trial court imposed a consecutive twenty-year sentence for the aggravated child abuse. Following the denial of his motion for new trial, at which the petitioner was represented by a third attorney, the petitioner filed a direct appeal with this court challenging: (1) that his right to counsel was violated during police questioning; (2) that the trial court erred in admitting autopsy photographs of the victim; (3) that the trial court erred in allowing an unqualified witness to give expert testimony; and (4) that the evidence

was not sufficient to sustain the convictions. No other issues were raised in the appeal. After review, this court affirmed the decisions of the trial court, and the application for permission to appeal to the Tennessee Supreme Court was denied.

Thereafter, the petitioner filed a pro se petition for post-conviction relief on October 10, 2007. Post-conviction counsel was appointed and filed a motion for expert services to aid in preparation for post-conviction, which was denied by the court. Thereafter, an evidentiary hearing was held at which multiple witnesses testified.

The first witness, Richard Rogers, was the investigator hired by trial counsel to assist in preparation of the petitioner's case. Mr. Rogers indicated that he had previously worked as an auditor and special agent with the Tennessee Bureau of Investigation, before starting work as a private detective in 2002. It was during this period that he was contacted by trial counsel, whom he knew from church, to assist in the petitioner's case. Mr. Rogers did acknowledge that this was the first case involving violent crime that he had ever been involved in. He indicated that he met with trial counsel after being retained, and they discussed how the investigation would proceed. Mr. Rogers first reviewed the interrogation videos tapes of the petitioner and Ms. Bratton before accompanying trial counsel to meet with the petitioner. During the interview conducted with the petitioner, he identified certain people who might be able to help his case.

With regard to two of the people mentioned by the petitioner, Dreka Chapman and Veronica Cook, Mr. Rogers testified that he attempted to locate these potential witnesses but was unable to do so. He indicated that he had gone to the addresses listed, spoken with the mail carrier, gone to the public water and utilities departments, and accessed various databases. Mr. Rogers acknowledged that it was possible that Ms. Chapman was incarcerated at the time, but he did not attempt to check the jail because he believed that trial counsel had informed him not to go through any law enforcement agencies to locate the witnesses. There was a notation made in Mr. Rogers file which indicated that he could not find these witnesses "because they could not be located within the limited time frame provided and the budget restriction of $500."

A third possible witness, Heather Underwood, was also mentioned by the petitioner. In Mr. Roger's memoranda from the petitioner's interview, he noted that the petitioner was often going to the home of Ms. Underwood, the sixteen-year-old girl who was the source of the petitioner's pending statutory rape charges. His report did not indicate whether or not he had attempted to locate Ms. Underwood. When asked at the hearing, Mr. Rogers testified that he could not recall whether or not he had attempted to locate her.

Mr. Rogers testified that he retained only a portion of his files at the time of the

hearing, as the rest had been shredded after the case was complete. He did recall that the petitioner had never informed him of a possible alibi during the investigation. Moreover, he specifically stated that, of the witnesses he was able to interview, none gave information which would be favorable to the petitioner.

The next witness called was Ronald Blanton, who was the attorney originally appointed to represent the petitioner in October 2002 and did so through July 16, 2003. Mr. Blanton testified that, after he accepted a position with the District Attorney General's Office, he filed a motion to withdraw from his representation of the petitioner. Mr. Blanton further stated that he and the petitioner had enjoyed a good working relationship and that he recalled that the petitioner was not happy with his withdrawal.

During his representation of the petitioner, Mr. Blanton filed several pre-trial motions and interviewed multiple possible defense witnesses, including police officers, first responders, and the medical examiner. He also attempted to speak with Ms. Bratton, but she refused his request. He testified that in April, 2003, he received an offer of settlement from the State, to plead to second degree murder with an open sentence, which he relayed to the petitioner. This agreement specifically resolved all charges against the petitioner- the felony murder, aggravated child abuse, and statutory rape. Mr. Blanton stated that after reviewing the plea agreement with the petitioner, they were unable accept the offer because the petitioner was insistent that he did not commit the crime. Mr. Blanton testified that he did make clear to the petitioner that he faced a possible life sentence if he was convicted at trial.

Prior to leaving private practice, Mr. Blanton talked with trial counsel and the trial court and suggested that trial counsel would be able to get up to speed fairly quickly on the petitioner's case, as he and Mr. Blanton had shared office space and he was familiar with the case. After trial counsel's appointment, he and Mr. Blanton met from time-to-time to discuss the petitioner's case, and Mr. Blanton continued to give input on the theory of the defense. Mr. Blanton indicated that the theory of the case was "reasonable doubt," as there was no physical evidence linking the petitioner to the crime.

After he began working at the District Attorney's Office, Mr. Blanton prepared a list of the clients he had previously represented which still had pending charges. The District Attorney distributed a memo to the other attorneys in the office directing them not to discuss these cases in Mr. Blanton's presence. However, written notification of this policy was not sent to the petitioner or any other former client. Mr. Blanton specifically testified that the policy put in place was adhered to by all the staff members. Nonetheless, trial counsel did file a motion to recuse the entire District Attorney General's Office from the trial. However, following a hearing, the motion was denied.

-8-

The next witness called was the attorney appointed to represent the petitioner following the withdrawal of trial counsel after the filing of the motion for new trial. Appellate counsel was appointed and argued the motion for new trial and prepared the case for direct appeal. He indicated that he raised four issues on appeal, but he did not raise the issue of whether the trial court erred in denying the motion to recuse the District Attorney General's Office. Appellate counsel testified that he did not raise that issue after reviewing the record before him. He indicated that he felt that no error resulted and that there were "better appellate issues and probably ones that demonstrated far more error." Appellate counsel stated he did not pursue the issue on appeal because he did not see any prejudicial effect.

The next witness called was the petitioner, who stated that he was from the Caribbean but had moved to the United States and served briefly in the military. After receiving a general discharge because of an incident with drugs, the petitioner moved to Portland, TN, and met Ms. Bratton, the victim's mother. The two began living together and eventually had another child. The petitioner remained adamant that he had not harmed the victim or caused her death.

The petitioner also testified about his relationship with sixteen-year-old Heather Underwood. He testified that, on the night of the murder, he had been at her house. He indicated that he had gone to her house some time before midnight and returned to his own home after midnight. The petitioner testified that he did give this information to the police, as well as to Mr. Blanton. In fact, he elaborated that the charge of statutory rape against him had arisen from his actions with Ms. Underwood on this night. The petitioner stated that he informed both the investigator and trial counsel of this as well and urged them to get in contact with Ms. Underwood to provide him an alibi. Nonetheless, on cross-examination, he acknowledged that he had informed the police in his statement that he was preparing to go to sleep at 10:00 p.m. that evening.

The petitioner also testified about his relationship with Mr. Blanton. He indicated that they communicated well with each other and that Mr. Blanton explained things to the petitioner. Nonetheless, he testified that when Mr. Blanton presented him the plea offer from the State, he did not understand that the other charges were being retired. He claimed it was this misunderstanding of the plea agreement that led to its refusal.

The petitioner stated that he was not happy when Mr. Blanton informed him that he was going to work for the District Attorney General because he felt like Mr. Blanton "had already" seen his file. When trial counsel was appointed, the petitioner indicated that he gave him the same information that he had given Mr. Blanton, including the information regarding Ms. Underwood and that Dreka Chapman knew that Ms. Bratton had said that the petitioner

did not kill the victim.

The petitioner testified that he did not get along as well with trial counsel. He also testified that, after trial counsel was appointed, he believed that the plea bargain was no longer an option and that they had to proceed to trial. The petitioner testified that trial counsel specifically told him this.

The last witness to testify, and the only one called by the State, was trial counsel. He testified that he and Mr. Blanton had worked in the same office and that he took over the representation of the petitioner following Mr. Blanton's return to the District Attorney General's Office. Trial counsel stated that he and the petitioner had discussed the issue of Mr. Blanton returning to the prosecutor's office, and he did not believe that the petitioner was overly concerned. Nonetheless, trial counsel filed a motion to recuse the District Attorney General's Office, and a hearing was held on the matter. After the motion was denied, trial counsel also filed an interlocutory appeal, which was also denied. At that point, trial counsel stated that he had no other options to pursue.

Trial counsel stated that he did hire Mr. Rogers to aid in the investigation of the case. Trial counsel acknowledged that there was some monetary limitations on the investigation that could be conducted, but he recalled no other limitation on how Mr. Rogers was allowed to conduct his investigation. His recollection was that Mr. Rogers was unable to corroborate any of the petitioner's statements or find any favorable information which might benefit the defense. Trial counsel denied that the petitioner had ever informed him that he was with Ms. Underwood on the night of the murder or that he had any possible alibi defense. Moreover, he could not recall any conversation he had with Ms. Underwood directly. He did acknowledge that a subpoena had been issued for her but never served.

Following his request for a settlement offer, the State sent trial counsel a letter offering an agreement whereby the petitioner would plead guilty to second degree murder and receive a sentence of seventeen years at 100%. Trial counsel stated that he reviewed this offer with the petitioner, and it was rejected. As was his practice, he also held a hearing on the record before the trial court detailing the terms of the offer and ensuring the petitioner's understanding of the agreement on the record. At that hearing, the petitioner explicitly rejected the agreement while indicating he understood the terms.

Trial counsel indicated that his entire trial strategy was one of reasonable doubt and focused on the fact that there were two adults in the house at the time of the murder. The petitioner consistently maintained his innocence, so trial counsel attempted to present to the jury that Ms. Bratton was a viable suspect, as she was on pain medication, recovering from surgery, stressed, and irritated.

-10-

After hearing the evidence presented, the post-conviction court entered an order denying relief. The petitioner filed a timely appeal.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in its determination that he had received the effective assistance of counsel. Specifically, he contends that the record establishes that trial counsel was ineffective by: (1) failing to adequately investigate the case; (2) failing to ensure that the petitioner understood the terms of the plea offer in the absence of a complete investigation; and (3) failing to preserve the issue of the District Attorney General's Office's recusal. As a separate issue, he also contends that the post-conviction court denied his right to due process by denying his application for reasonable funds to assist post-conviction counsel in the investigation of the petition. Following review, we conclude no error has occurred.

**I. Ineffective Assistance of Counsel**

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

For deficient performance, the petitioner must show that "counsel's representation fell

below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id*. at 687. "The [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

### a. Failure to Investigate

The petitioner's first assertion of error in his argument for ineffective assistance of

counsel is that trial counsel failed to adequately investigate the facts of the case. He asserts that trial counsel:

> failed to conduct an appropriate investigation by directing his investigator not to contact law enforcement agencies, failed to ask for adequate funds to conduct the investigation, failed to hire a qualified investigator with violent crime or murder experience, failed to direct the investigator to locate witnesses through appropriate means, . . . and failed to follow-up on leads provided by others regarding potential alibi witnesses, ie; Heather Underwood . . . .

The State, as did the post-conviction court, disagrees. In the order denying relief, the post-conviction court made the following relevant findings:

> The evidence reflects that [trial counsel's] preparation was extensive. After motioning the Court for funds to hire a private investigator, he reviewed the investigation and interviews were conducted by the investigator, Mr. Richard Rogers. Although the record clearly reflects that Heather Underwood could not be located, trial counsel issued a subpoena for Ms. Underwood for the jury trial. The record also reflects that [trial counsel] met with Ron Blanton on more than one occasion and spent 2.7 hours of time, including fifteen to twenty minutes travel each way, with Dr. Derring, the medical examiner who testified about the autopsy in this case. Further, [trial counsel] contacted a pharmacist about drugs used by the mother, and he worked on developing a trial strategy of reasonable doubt and of pointing the finger of guilt toward the mother of the victim, Katisha Bratton, who had been taking pain medication before the homicide.
>
> . . . .
>
> Petitioner testified at the evidentiary hearing, and the Court finds that his testimony was not believable, credible, or truthful. In fact, he testified, which was the first time he had ever mentioned this since the death of the victim in January 2002, that he was with Heather Underwood for some of the time the night the victim was murdered. The record clearly reflects that he had never, ever, told that to anyone before. . . .

Our review of the record reveals nothing which preponderates against the post-conviction court's findings.

> Trial counsel requested funds and hired an able investigator. That Mr. Rogers had

-13-

never investigated a violent crime before does not negate his years of experience in investigation with the T.B.I as both an auditor and special agent. Trial counsel and Mr. Rogers both met with the petitioner and reviewed the recorded interviews. The petitioner supplied them with names of possible witnesses, and Mr. Rogers attempted to locate those people. Testimony was given that he conducted an exhaustive search for the possible witnesses, but he was simply unable to locate them. Moreover, of those witnesses that were located, none were able to offer any information beneficial to the petitioner's case. There was simply no evidence put forth in this record that a request for more funds, a different investigator, or different search methods would have led to better results.

Moreover, the petitioner's argument largely focuses on trial counsel's failure to locate and interview two possible witnesses, Dreka Chapman and Heather Underwood. However, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). By not presenting these witnesses at the hearing, the petitioner is precluded from establishing prejudice from the failure to interview or present them at trial.

As noted by the post-conviction court, trial counsel developed a defense strategy of reasonable doubt based upon the presence of the victim's mother in the home at the time of the murder. He investigated and took the appropriate steps to further that defense. We must agree that the record shows that trial counsel's "preparation was extensive." As such, the petitioner has failed to establish his claim.

### b. Plea Offer

The petitioner's next assignment of error is that he did not understand the negotiated plea offer presented by the State. We must assume that he faults counsel for this alleged lack of understanding. In support of this contention, he relies upon his own testimony at the hearing that he understood from Mr. Blanton that the offer did not dispose of the other charges and from trial counsel that no offer remained on the table. He asserts that this lack of understanding prevented him from entering into a knowledgeable settlement of the case. We conclude this contention is in no way supported by the record.

In its order denying relief, the post-conviction court specifically stated that the petitioner's "testimony about the plea offers in the case was not truthful." As has been noted multiple times, it is not the province of this court to reweigh or re-evaluate credibility determinations made by the finder of fact. *See Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999).

-14-

The proof establishes that the plea offer was explained thoroughly to the petitioner. Mr. Blanton stated that he reviewed and explained the offer to the petitioner and that he understood its terms. Trial counsel testified similarly and added that he had the petitioner appear before the trial court to ascertain his understanding. The transcript of that proceeding is included in this record. It reveals a thorough explanation of the offer made in the petitioner's presence. It also reflects that the petitioner himself stated that he understood the sentence he faced if convicted, understood the offer, and unequivocally rejected the plea offer. He cannot, in light of such sworn testimony, now credibly deny his understanding of the offered agreement. The petitioner is entitled to no relief.

### c. Recusal Issue

The petitioner's final assertion of ineffective assistance of counsel is directed not to trial counsel but rather to appellate counsel. He contends that appellate counsel was ineffective for failing to raise the recusal issue in an amended motion for new trial or on direct appeal. The same test applies in determining the effectiveness of both trial and appellate counsel. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). Appellate counsel does not have a constitutional obligation to raise every conceivable argument that might be made on appeal, *id*. (citations omitted), and the determination of which issues to present on appeal is a matter generally addressed to the professional judgment and sound discretion of appellate counsel, as these are tactical and strategic choices which should not be second-guessed. *Porterfield v. State*, 897 S.W.2d 672, 678 (Tenn. 1995); *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993). In determining whether appellate counsel's failure to raise an issue on appeal constitutes ineffective assistance of counsel, our supreme court has held that "unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim." *Carpenter*, 126 S.W.3d at 887-88.

On appeal, the petitioner acknowledges that appellate counsel testified that he raised the four issues in the direct appeal that he felt had merit. However, he finds fault with appellate counsel's testimony that he did not raise the recusal of the district attorney's office because he felt that the petitioner was not "prejudiced" by the decision. The petitioner contends that appellate counsel evaluated whether to raise the issue under the wrong standard- prejudice as opposed to the appearance of impropriety. He relies heavily upon, and attempts to distinguish, the case of *State v. Coulter*, 67 S.W.3d 3 (Tenn. Crim. App. 2001), to support his argument.

In *Coulter*, also a case involving recusal of a district attorney general's office, the court noted that the prosecution carries the burden of establishing by clear and convincing

evidence that appropriate screening measures have been undertaken to insulate the "infected" attorney from the ongoing prosecution. *Id*. at 30. The court went on to note that any determination of whether a prosecutor's disqualification must be imputed to the entire District Attorney General's office depends on a case-by-case evaluation of the screening mechanisms employed. *Id*. Three factors were proffered in order to make this determination:

> 1) the structural organization of the law firm or office involved,
> 2) the likelihood of contact between the "infected" person and the specific attorney and support personnel involved in the present representation,
> 3) the existence of law firm or office rules which prevent the "infected" person a) from access to relevant files or other information pertaining to the present litigation and b) from sharing in the fees derived from such litigation.

*Id*. at 30-31 (citing *Clinard v. Blackwood*, 46 S.W.3d 177, 184 (Tenn. 2001)). In weighing these factors, the trial court concluded in this case that recusal was not mandated. We agree with that conclusion. Moreover, appellate counsel also apparently agreed because he specifically testified that believed that no prejudice resulted.

The petitioner does not appear to contest this conclusion of actual prejudice. Rather, he relies upon further language in *Coulter* which also mandated that "an appearance of impropriety many require vicarious disqualification even if the disqualified attorney and his associates employ adequate screening mechanisms." *Id*. at 31. Citing to *Clinard*, which dealt with a private law firm's disqualification, the court noted that: (1) the mere possibility of impropriety is insufficient to warrant disqualification; (2) "objective public perception rather than the subjective and 'anxious' perceptions of litigants governs;" (3) the existence of an appearance of impropriety is to be determined from the perspective of a reasonable lay person; and (4) the reasonable lay person is deemed to have been informed of all the facts, including whether and to the extent the screening mechanisms were employed. *Id*.

While we agree with the petitioner that this is the applicable standard set forth in *Coulter*, his argument appears to ignore the fact that the *Coulter* court went on to note that "private and public practice have significant distinctions, such that screening procedures for attorneys in government service are generally viewed with less skepticism: "The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation in private practice." *Id*. at 32 (citing *State v. Ricky Raymond Bryan*, No. M1999-00854-CCA-R9-CD (Tenn. Crim. App. at Nashville, Aug. 4, 2000)). The court noted that it had been repeatedly observed that a prosecutor's disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise

participate in the prosecution." *Id*. (citing *State v. Tate*, 925 S.W.2d 548, 556 (Tenn. Crim. App. 1995). In other words, "early and adequate screening in the case of actual conflict or the appearance of impropriety should usually resolve [the] problem." *Id*. The court noted that, in these type situations, "the appearance of impropriety is not the central concern," rather "it is a matter of an unacceptable risk of harm or disclosure [of confidential information] which is at issue." *Id*.

In the instant case, review of the record, which includes a transcript of the hearing on the recusal matter, leads us to conclude that the mechanisms put in place in this case were sufficient to ensure that no prejudice resulted to the petitioner. Testimony was given that a staff meeting was held and other attorneys were specifically informed not to discuss certain cases with Mr. Blanton. Later, a written memo was distributed specifically denoting his former cases. Mr. Blanton specifically testified that he did not discuss any of his former cases with anyone in the district attorney general's office, and his fellow colleagues also adhered to the mandate. Based upon these facts, we are unable to conclude that, had appellate counsel raised this issue on appeal, he would have been successful. We cannot conclude that either actual prejudice or an appearance of impropriety resulted. As such, the petitioner is unable to establish prejudice with regard to his ineffective assistance of counsel claim. Thus, no relief is warranted.

## II. Expert Services

As his final issue, the petitioner asserts that the post-conviction court erred by denying his motion for expert services to aid in the preparation for post-conviction. He contends that experts were "necessary in order to protect the constitutional rights of the Petitioner." While making this argument, the petitioner does acknowledge that the post-conviction court was bound by the decision in *Davis v. State*, 912 S.W.2d 689 (Tenn. 1995) and Tenn. Sup. Ct. R. 13, Section 2(a)(2) and Section 5(a)(2), which prohibit the authorization of expert services in non-capital post-conviction proceedings. The petitioner asserts that the issue is raised only in order to preserve it for further appellate review. However, like the post-conviction court, we, as a lower court, are bound by the law set forth by our supreme court and decline the invitation to address the merits of its rulings. With respect to this tribunal, the petitioner has not established an entitlement to any relief.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE